**Gustav Horacio KUPER, Plaintiffs,**

v.

**Mary C. MULREAN, Acting Director U.S. Immigration and Naturalization Service, Defendant.**

**No. 01–CV–0308 R(JAH).**

United States District Court, S.D. California.

June 26, 2002.

Robert A. Mautino, Mautino and Mautino, San Diego, CA, for Plaintiffs.

U.S. Attorney CV, U.S. Attorneys Office Southern District of California Civil Division, San Diego, CA, for Defendant.

## ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT

RHOADES, District Judge.

### I. Overview

Plaintiff Gustav Horacio Kuper ("Plaintiff") filed a Complaint against Defendant Mary C. Mulrean, Acting Director of the United States Immigration and Naturalization Service ("Defendant") praying for declaratory judgment that Plaintiff is a citizen of the United States and as such is entitled to the issuance and possession of a Certificate of Citizenship and reasonable attorney fees. On October 1, 2001, Plaintiff moved for summary judgment, claiming that Plaintiff's father was a U.S. citizen in 1958 when Plaintiff was born and thus Plaintiff received U.S. citizenship at birth. On October 15, 2001, Defendant filed an opposition to Plaintiff's motion for summary judgment, and Plaintiff filed a reply to Defendant's opposition on October 29, 2001.

■ On April 22, 2002, the parties presented oral arguments on Plaintiff's motion for summary judgment. At the hearing, the Court made a sua sponte motion for summary judgment on behalf of Defendant.[1] Defendant filed a brief in support of the Court's motion for summary judgment on April 30, 2002. Plaintiff filed an opposition on May 14, 2002, and Defendant filed a reply on May 20, 2002. For the reasons stated below, the Court grants summary judgment for Defendant.

### II. Background[2]

Plaintiff was born in Nicaragua in 1958. His mother was a citizen of Nicaragua. The citizenship of Plaintiff's father at the time of Plaintiff's birth is at issue in this case. Plaintiff claims that his father was a U.S. citizen at the time of his birth, thereby conferring U.S. citizenship to Plaintiff upon his birth pursuant to § 301(g) of the Immigration and Nationality Act. *See* 8 U.S.C. § 1401(g) (2002) (formerly 8 U.S.C. § 1401(a)(7)). Defendant, however, claims that since Plaintiff's father relinquished his United States citizenship *in either 1942 or 1944,* he was not a United States citizen when Plaintiff was born in 1958.

Plaintiff's father was born in Nicaragua on June 24, 1918. He immigrated to the United States in approximately 1925 and became a naturalized citizen of the United States in approximately 1931. In 1942, Plaintiff's father left the United States to return to Nicaragua, with the intent not to return to the United States. In 1944, Plaintiff's father appeared in person at the American Embassy in Managua, Nicaragua, and signed a document renouncing his United States citizenship. Plaintiff and Defendant claim different factors motivated Plaintiff's father's 1944 renunciation of citizenship. Plaintiff claims that officials at the "American Embassy in Nicaragua located his father and began to pressure him about his status." (Pl.'s Mot., p. 3). Defendant's position is outlined in the Administrative Order issued by the Immigration and Naturalization Service's Office of Administrative Appeals, to which Plaintiff appealed after his initial request requesting a Certificate of Citizenship was denied. *See* Exhibit[3] 1. Defendant's assert that

---

**1.** A district court may issue summary judgment on its own motion where parties have been given adequate notice of dispositive nature of proceedings. *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Portsmouth Square, Inc. v. Shareholders Protective Comm.,* 770 F.2d 866, 869 (9th Cir.1985).

**2.** The Court takes the following statement of facts from the parties' briefs. The Court expresses no view on the accuracy of those facts.

**3.** All references to "Exhibit" refer to the exhibits attached to and filed with Plaintiff's Memorandum of Points and Authorities in

Plaintiff's father's appearance at the United States Embassy in Nicaragua "on January 18, 1944, concerned whether the U.S. government would seek his deportation/extradition to the United States to face charges relating to Selective Service violations or whether he would be permitted to renounce his U.S. citizenship." (Exhibit 1, p. 3).

Prior to initiating this action, Plaintiff had applied to the District Director of the Immigration and Naturalization Service ("INS") for a Certificate of Citizenship on February 12, 1993. This application was denied on June 28, 1995, and Plaintiff subsequently filed an administrative appeal with the INS Administrative Appeals Office ("AAO"). On October 25, 1997, the AAO denied Plaintiff's appeal; however, Plaintiff was not informed of the denial until December 26, 2000.

In deciding Plaintiff's appeal, the AAO requested that the Department of State issue an advisory opinion as to the facts concerning whether Plaintiff's father renounced his citizenship. Based on information provided by the Department of State, the AAO concluded that "the intentions of the Plaintiff's father concerning further residence were unclear and appeared largely dependent upon what actions the U.S. government contemplated." (Exhibit 1, p. 3.) The AAO Order stated that, as of April 19, 1944, the Plaintiff's father was a United States citizen and that on that date, he effectively renounced his U.S. citizenship.

Plaintiff's father is now deceased. Plaintiff is "lawfully in the United States. He is not subject to any deportation/removal proceedings," nor is he "under investigation for any criminal misconduct that could have any impact at all on his lawful resident states." (Pl.'s Reply, pp. 6–7).

## III. Legal Standard: Summary Judgment

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See id.* at 322–23, 106 S.Ct. 2548. Once the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"[S]ua sponte summary judgment is appropriate where one party moves for summary judgment and, after the hearing, it appears from all the evidence presented that there is no genuine issue of material fact and the *non-moving* party is entitled to judgment as a matter of law." *Portsmouth Square, Inc. v. Shareholders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985) (citing *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir.1982)).

## IV. Discussion

Plaintiff claims that he derived United States citizenship from his father pursuant

Support of Motion for Summary Judgment on        October 1, 2001.

to the Immigration and Nationality Act. *See* 8 U.S.C. § 1401(g). Section 301(g) of this Act provides, in pertinent part, that a person born outside the geographical limits of the United States to parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of the person, was physically present in the United States for a period totaling not less than 10 years, at least .5 of which were after attaining the age of 14 years, shall be a national and citizen of the United States at birth. *Id.*

### A. Relevant Undisputed Facts

The following facts are undisputed. Plaintiff's father became a naturalized citizen of the United States in 1931. In 1942, he expatriated from the United States to his home country of Nicaragua, intending not to return to the United States. Then, in 1944, Plaintiff's father signed a document formally renouncing his citizenship at the United States Embassy in Nicaragua. Plaintiff was born in Nicaragua in 1958. His mother was not a United States citizen.

### B. Law Relating to Father's Citizenship

First the court will look at the effect that the laws in existence in 1942 and 1944 had on Plaintiff's father's actions in 1942 and 1944, respectively. Next, the court will determine the effect that the later, retroactive, Supreme Court decision *Afroyim v. Rusk*, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967), *overruling, Perez v. Brownell*, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958), had on both events and the effect that the two events had on each other.

#### 1. The Events of 1942

At the time Plaintiff's father left the United States to return to Nicaragua in 1942, he ostensibly renounced his citizenship under a multi-lateral treaty to which the United States and Nicaragua were parties. The treaty provided that:

> If a citizen, native of any of the countries signing the present convention, and naturalized in another, shall again take up residence in his native country *without the intention of returning to the country in which he has been naturalized,* he will be considered as having reassumed his original citizenship, and as having renounced the citizenship acquired by the said naturalization.

Status of Naturalized Citizens Who Return to Country of Origin (Inter–American), Aug. 13, 1906, Art. I, 37 Stat. 1653, 1 Bevans 544 (emphasis added). This treaty was officially terminated by the United States on October 20, 1980, effective October 20, 1981. *Notification of Termination,* 80 Dep't St.Bull. 78 (Dec.1980).

Additionally, the United States also signed a separate treaty with Nicaragua, which provided: "if a citizen of Nicaragua naturalized in the United States renews his residence in Nicaragua without intention to return to the United States it shall be deemed that he has renounced his citizenship in the United States." Naturalization Convention Between the United States and Nicaragua, Dec. 7, 1908, U.S.—Nicar., 37 Stat. 1560. This treaty was officially terminated on October 25, 1980, effective October 24, 1981. *Notification of Termination,* 80 Dep't St.Bull. 79 (Dec. 1980).

Both Plaintiff and Defendant agree that when Plaintiff's father returned to Nicaragua in 1942, he did so with the intention of not returning to the United States. Thus, under the treaties existing at the time, if Plaintiff's father had the requisite intent of not returning to the United States, then when he left the United States in 1942 to return to Nicaragua, he lost his United States citizenship as a matter of law.

### 2. The Events of 1944

The events in 1942 aside, there is no doubt that the events of 1944, alone, would have served to revoke Plaintiff's father's citizenship under the laws in existence at the time, provided that the father was a citizen of the United States at the time. The Nationality Act of 1940 provided that "a person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by ... making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state ..." 54 Stat. 1137, 1169 (1940). Thus, when Plaintiff's father signed the formal renunciation at the U.S. Embassy in Nicaragua in 1944, he formally renounced his United States citizenship under the laws in existence at the time. *Id.* However, the court need not extensively assess the laws as they existed in 1942 and 1944, as the events of those years must be reexamined under the standards set forth in the later Supreme Court decision, *Afroyim v. Rusk.*

### 3. The Effects of the Supreme Court's Decision in *Afroyim v. Rusk*

Twenty years after the 1942 and 1944 events, the Supreme Court decided a case that changed the law regarding loss of citizenship. *See Afroyim v. Rusk*, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967). In *Afroyim*, the Court held that a person may be divested of his United States citizenship only if he "voluntarily relinquishes that citizenship," effectively overruling previous laws which had allowed the U.S. government to strip a U.S. citizen of his citizenship. *Id.* at 267, 87 S.Ct. 1660. Numerous courts have utilized the standards set forth in *Afroyim* retroactively, for the purpose of assessing renunciations of citizenship which occurred before 1967. *See e.g., Rocha v. INS*, 450 F.2d 946 (1st Cir.1971); *U.S. v. Lucienne D'Hotelle De Benitez Rexach*, 558 F.2d 37 (1st Cir.1977); *U.S. v. Matheson*, 532 F.2d 809 (2d Cir.1976).

The general mandate set forth in *Afroyim* was clarified and expanded upon 13 years later in *Vance v. Terrazas*, 444 U.S. 252, 270, 100 S.Ct. 540, 62 L.Ed.2d 461 (1980) (in proving expatriation, an expatriating act and an intent to relinquish citizenship must be proved by a preponderance of the evidence). *Terrazas* built upon the voluntariness requirement of *Afroyim* and established a two prong test to determine whether a relinquishment of United States citizenship was valid. In order to be valid all relinquishments must contain: (1) an expatriating act and (2) an intent to relinquish citizenship. *Id.* at 270, 87 S.Ct. 1660.

Given that the laws regarding citizenship changed under *Afroyim*, the events of 1942 and 1944 must be reassessed to determine whether they contained the necessary expatriating act and intent to relinquish citizenship as required under *Afroyim* and *Terrazas*. As to the events of 1942, while Plaintiff's father's return to Nicaragua (with the intent not to return to the United States) may sufficed under the treaties in existence at that time to revoke his United States citizenship, *Afroyim* retroactively applies, thereby changing the effect of the laws in existence at that time. After *Afroyim*, the only way Plaintiff's father could have lost his citizenship in 1942 is if the expatriating act was completed (he had returned to the country of his origin with the intent not to return to the United States) *and* he had exhibited a clear intent (either verbally or by his actions) to relinquish his U.S. citizenship. Plaintiff's father's return to Nicaragua with the intent not to return to the United States constitutes the necessary expatriating act. However, Plaintiff has provided no evidence demonstrating his father's intent to relinquish his United

States citizenship. In fact, Plaintiff admits that there is no evidence that his father intended to relinquish his citizenship upon his 1942 return to Nicaragua. Pl.'s 10/29/01 Reply at 6. Plaintiff's father's departure from the United States in 1942 is not evidence in itself to an intent to relinquish his citizenship. *See Terrazas,* 444 U.S. at 261, 100 S.Ct. 540 ("performance of an expatriating act cannot, standing alone, constitute conclusive evidence of the requisite intent"). Therefore, since there is no proof that Plaintiff's father intended to relinquish his citizenship in 1942, the intent element required under *Afroyim* and *Terrazas,* is lacking. Thus, under *Afroyim,* Plaintiff's father was still a citizen in 1942 even though he had left the United States with the intent not to return.

Given that under *Afroyim* Plaintiff's father was not stripped of his citizenship in 1942; he was a United States citizen when he signed the formal renunciation at the United States Embassy in 1944. Therefore, Plaintiff's claim that the 1944 renunciation was void because his father was not a United States citizen at the time fails as a matter of law, because Plaintiff's father was a United States citizen in 1944. Additionally, the events of 1944 satisfy the requirements under *Afroyim.* In signing the formal renunciation of his citizenship at the United States embassy in Nicaragua, Plaintiff's father satisfied the requirements for both an expatriating act and the intent to relinquish U.S. citizenship under *Afroyim* and *Terrazas.* The signing of the document constituted the expatriating act. *See* Nationality Act of 1940, 54 Stat. 1137, § 401(f). The wording and formalized circumstances behind the "Oath of Renunciation of the Nationality of the United States" signed by Plaintiff's father in 1944 clearly establish the intent: "I hereby *absolutely and entirely renounce my nationality in the United States* and all rights and privileges thereunto ..." (Exhibit 2)

(emphasis added). Therefore, under the standards set forth in *Afroyim,* Plaintiff's father's 1944 renunciation of United States citizenship was valid, and thus as a matter of law, Plaintiff could not have derived U.S. citizenship from his father when he was born in 1958.

Additionally, Plaintiff's argument that since the purpose of *Afroyim* is ameliorative and not destructive, it cannot be applied retroactively to "destroy" Plaintiff's or his father's U.S. citizenship, also fails. The application of *Afroyim* here does not "destroy" Plaintiff's father's citizenship; rather, it simply shifts the date of expatriation from 1942 to 1944.

Finally, even if *Afroyim* were not retroactive to the events of 1942 and 1944, Plaintiff's claim would still fail as a matter of law. If *Afroyim* were not retroactive, then when Plaintiff's father returned to Nicaragua in 1942 with the intent to not return to the United States, he would have relinquished his citizenship under the prevailing laws at that time. Thus, there would be no need to assess the events of 1944, as Plaintiff's father would have ceased to be a United States citizen in 1942. Either way, whether or not *Afroyim* is retroactive, Plaintiff's father was not a United States citizen when Plaintiff was born in 1958.

## C. This Case Is Proper For Determination on Summary Judgment

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. For a party to be entitled to judgment as a matter of law, he must prove, on all matters upon which he would have the burden of proof at trial, that "no reasonable trier of fact could find other than" for moving party. *Calderone v.*

*United States,* 799 F.2d 254, 259 (6th Cir. 1986).

The burden of establishing that his father was a United States citizen at time of Plaintiff's birth rests with the Plaintiff. 8 C.F.R. § 341.2(c) (2002). At trial, Plaintiff would be required to prove this by preponderance of the evidence. *Id; see also, Terrazas,* 444 U.S. at 270, 100 S.Ct. 540. However, Plaintiff has been unable to provide evidence to counter his father's renunciation of citizenship in 1944. Therefore, Plaintiff's motion for summary judgment is denied as he has failed to meet his burden of establishing the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

In contrast, Defendant has provided evidence which demonstrates that there is no issue of material fact as to Plaintiff's father's citizenship in 1944, and therefore Defendant is entitled to judgment as a matter of law. The requirement that there be "no genuine dispute" about a material fact is determined by whether a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248–250, 106 S.Ct. 2548. This case presents unique factors which create the absence of a genuine issue of triable fact. The events in this case occurred in 1942 and 1944, almost 60 years ago. A trial would not bring to light more facts than those already established in the record. Thus, with the facts in the record, Defendant has presented evidence that Plaintiff's father renounced his citizenship in 1944 and as such Plaintiff could not have received U.S. citizenship from his father at his birth in 1958. Therefore, no reasonable jury could return a verdict in favor of the Plaintiff, and Defendant's motion for summary judgment is granted.

Additionally, summary judgment is also particularly appropriate on review of administrative action. *McCall v. Andrus,* 628 F.2d 1185 (9th Cir.1980). This case is based on Plaintiff's appeal of the INS's Administrative Order which denied him a Certificate of Citizenship. The Administrative Order which dismissed Plaintiff's 1995 appeal concluded that Plaintiff "failed to show that he acquired United States citizenship at birth because he failed to establish that his father was a United States citizen at the time of his birth in 1958." (Exhibit 1, p. 3.). Therefore, given the evidence on the record, Defendant has met her burden and so her motion should be granted.

## V. Conclusion

For the reasons stated above, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment.

**IT IS SO ORDERED.**